IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

IVAN ARMIJO,
*as Personal Representative of*
EDWIN ARMIJO, *deceased*

     Plaintiff,

v.                                    Civ. No. 20-355 GBW/SMV

BOARD OF COUNTY COMMISSIONERS
OF THE COUNTY OF SOCORRO, *et al.*,

     Defendants.

## ORDER GRANTING MOTION TO AMEND COMPLAINT
## AND DENYING MOTION TO DISMISS

THIS MATTER comes before the Court on Defendants' Motion to Dismiss State

Claims Arising out of Sections 41-4-6 and 41-4-10 of the New Mexico Tort Claims Act

(*doc. 4*) and Plaintiff's Motion to Amend Complaint (*doc. 14*).  Having reviewed the

motions and their attendant briefing (*docs. 15, 17, 21, 23, 28, 29*), the Court GRANTS

Plaintiff's Motion to Amend and DENIES Defendant's Motion to Dismiss as MOOT for

the reasons herein.

I.     **BACKGROUND**

This is a wrongful death case arising from the suicide of Edwin Armijo during

his imprisonment at the Socorro County Detention Center ("SCDC").  *See generally doc.*

*1–2.*  Plaintiff's allegations are as follows: On March 28, 2017, SCDC booked and

received custody of Mr. Armijo, who had been sentenced to eleven days of imprisonment. *Id.* at ¶ 11. The following day, Mr. Armijo's brother attempted to visit him. *Id.* at ¶ 12. After SCDC cancelled the visit, Mr. Armijo's brother informed SCDC Officer Celia Burrows that Mr. Armijo "was suicidal, that he had tried to commit suicide, that he could harm himself, and that SCDC needed to watch him." *Id.*

On March 29, 2017 and again on March 30, 2017, Mr. Armijo's brother repeatedly called SCDC about Mr. Armijo's potential for self-harm. *Id.* at ¶ 13. Each time, he spoke with Tim O'Neill, the Administrative Assistant to SCDC Administrator Ed Sweeney, and informed Mr. O'Neill that Mr. Armijo "was suicidal, that [his] wife had just passed away, that he was mentally unstable, that he had tried to commit suicide, and that SCDC needed to watch him." *Id.; see also id.* at ¶ 23. Mr. O'Neill also transferred these phone calls to SCDC's booking station and guard console so Mr. Armijo's brother could inform on-duty SCDC staff, including SCDC Investigator Sean Duffy and Defendant Mickaela Pargas, that Mr. Armijo was suicidal. *Id.* at ¶¶ 16–17, 23.

Also, on March 29, 2017, a prisoner in the cell adjoining that of Mr. Armijo informed Defendant Tommy Diaz that Mr. Armijo "was running and slamming his head into the wall." *Id.* at ¶ 18. Defendant Diaz reported this incident to Investigator Duffy and Defendant Pargas. *Id.* at ¶¶ 18, 20. Investigator Duffy informed Defendants

Diaz and Pargas that Mr. Armijo needed to be monitored and that suicide precautions were warranted.  *Id.* at ¶¶ 19–20.

At no time, however, did either Defendant or any other SCDC employee take action responsive to Mr. Armijo's suicidal mental state or potential for self–harm.  *Id.* at ¶¶ 25, 30.  Then, on March 31, 2017, Mr. Armijo fashioned a noose out of a bed sheet in his cell, hung himself from the cell's phone console, and died.  *Id.* at ¶¶ 26–28.

Almost two years later, Plaintiff filed a complaint for Wrongful Death in the Seventh Judicial District Court of Socorro County.  *Doc. 1-1.*  The complaint raised negligence claims against Defendant Board of County Commissioners of the County of Socorro ("BCCCS") under the Wrongful Death Act of New Mexico (N.M. Stat. Ann. §§ 41-2-1, *et seq.*) and the New Mexico Tort Claims Act (N.M. Stat. Ann. §§ 41-4-1, *et seq.*, "TCA"), specifically Section 41-4-6 (operating or maintaining a public building), Section 41-4-9 (operating a medical facility), and Section 41-4-10 (providing health care services).  *Id.*  After the parties completed some discovery, Defendant BCCCS filed a motion to dismiss and a motion for summary judgment.  *See doc. 3-1* at 2.

On April 13, 2020, Plaintiff filed an amended complaint ("First Amended Complaint").  *Doc. 1-2.*  This complaint retained his negligence claims against Defendant BCCCS in Count I and added Eighth and Fourteenth Amendment claims against Defendants Pargas and Diaz in their individual capacities pursuant to 42 U.S.C. § 1983 in Counts II, III, and IV.  *See id.*  On April 20, 2020, Defendants removed the First

Amended Complaint to this Court.  *Doc. 1*.  A week later, Defendants filed a motion for summary judgment on the applicability of Section 41-4-9 of the TCA to the negligence claims asserted in Count I of this Complaint.  *Doc. 5*.  After allowing Plaintiff to depose Mr. Sweeney about the Standard Operating Policy and Procedures ("SOPPs") that he used to operate SCDC at the time of Mr. Armijo's death, *see doc. 31*, the Court granted summary judgment on the inapplicability of this waiver to the negligence asserted in Count I.  *Doc. 36*.

On April 27, 2020, Defendants also filed the instant motion to dismiss the negligence claims in Count I that arise from waivers of sovereign immunity in Sections 41-4-6 and 41-4-10 of the TCA.  *Doc. 4*.  On June 16, 2020, Plaintiff filed his response and moved the Court for leave to file a Second Amended Complaint that pleads additional factual allegations about, *inter alia*, the prevalence of suicide in prisons and SCDC policies for identifying and caring for suicidal prisoners.  *Doc. 14*; *doc. 15*.  Two days later, Plaintiff filed a supplemental response.  *Doc. 17*.  Defendant filed a response to Plaintiff's motion to amend on June 29, 2020.  *Doc. 21*.  Briefing was complete for the motion to dismiss on June 30, 2020 with the filing of Defendant's reply and for the motion to amend on July 14, 2020 with the filing of Plaintiff's reply and notice of related errata.  *Doc. 23*; *doc. 24*; *doc. 28*; *doc. 29*; *doc. 30*.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 15(a) allows a party to amend its pleading once as a matter of course if certain temporal conditions are met.  Fed. R. Civ. P. 15(a)(1).  Otherwise, as is the case here, the party must obtain either the written consent of opposing parties or the leave of the Court to amend its pleadings.  Fed. R. Civ. P. 15(a)(2).

The decision to grant leave to amend a complaint is a matter of the Court's discretion.  *Castanon v. Cathey*, 976 F.3d 1136, 1144 (10th Cir. 2020).  But, "[t]he [C]ourt should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  "Refusing leave to amend is generally only justified upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment."  *Frank v. U.S. West, Inc.*, 3 F.3d 1357, 1365 (10th Cir. 1993) (citation omitted); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962)).

"[A] pleading that has been amended under Rule 15(a) supersedes the pleading it modifies….").  *Gilles v. United States*, 906 F.2d 1386, 1389 (10th Cir. 1990).  Therefore, if a motion to amend is granted, a motion to dismiss the earlier complaint is properly denied as moot.  *Gotfredson v.Larsen LP*, 432 F. Supp.2d 1163, 1172 (D. Colo. 2006).

III.    **ANALYSIS**

The Court grants Plaintiff leave to file his Proposed Second Amended Complaint since all the *Frank/Foman* factors favor amendment.  Amendment is not unduly delayed as Plaintiff has provided the Court with adequate explanations for not pleading earlier the additional factual allegations his Proposed Second Amended Complaint.  Nor is amendment unduly prejudicial because, at this stage in proceedings, making additional factual allegations about the same occurrences pled in the operative First Amended Complaint does not materially impact Defendants' ability to defend against them. Amendment is not done in bad faith since there is no showing of an improper motive or purpose.  Finally, amendment is not futile since Count I of the Proposed Second Amended Complaint falls within the scope of Section 41-4-6's waiver of sovereign immunity on its face and facts material to this waiver's applicability to the negligence pled in this Count remain objects of dispute.

A.  UNDUE DELAY

Plaintiff's Proposed Second Amended Complaint is not unduly delayed since he has provided the Court with adequate explanations for not pleading the proposed, additional factual allegations earlier.  Emphasis in this inquiry is on the adverb: "Lateness does not of itself justify the denial of [an] amendment." *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1205 (10th Cir. 2006) (quoting *R.E.B., Inc. v. Ralston Purina Co.*, 525 F.2d 749, 751 (10th Cir. 1975)).  In the Tenth Circuit, the analysis "focuses primarily on

the reasons for the delay." *Minter*, 451 F.3d at 1206.  District courts, like this one, may

deny leave to amend where the movant has no adequate explanation for not seeking

permission to amend earlier or not including the proposed amendments in an earlier

pleading.  *Id.*; *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1130 (10th Cir. 1998);

*Frank*, 3 F.3d at 1365–66.

      Here, Plaintiff does not dispute that he has known about all of the additional

factual allegations proposed in his Second Amended Complaint since the summer of

2019 (after discovery began on this case in state court) and that he could have included

these allegations in his First Amended Complaint that Defendants removed to this

Court.  Nor does he dispute that he could have pled the specific policy violations

proposed in his Second Amended Complaint in his original complaint as he has

possessed a copy of these policies since June 2017.  *See doc. 21* at 6–7, 9–10; *doc. 28* at 3.

      Instead, Plaintiff explains that he did not plead the specific policy violations in

either complaint since he wished to confirm that these policies were operational at the

time of Mr. Armijo's death before pleading them and did not have opportunity to do so

before filing either his original complaint or his First Amended Complaint.  *Doc. 28* at 2–

3.  Plaintiff explains that he omitted the statistical allegations about the prevalence of

suicide from his original complaint because he had not yet retained the expert who gave

him these statistics.  *Doc. 38* at 2.  As to the failure to include these statistics in his First

Amended Complaint, Plaintiff explains that he made this first amendment only to add

Section 1983 claims against individual Defendants before their statute of limitations expired and did not include these statistics therein as they were unnecessary to meet the state court's lower pleading standards. *Doc. 28* at 2–3. Plaintiff explains that he makes these statistical allegations and specific policy violations in his Proposed Second Amended Complaint to avoid dismissal under this Court's heightened pleading requirements now that Defendants have removed his First Amended Complaint to this Court. *Id.* at 3.

The Court finds Plaintiff's explanations adequate. They establish that Plaintiff is not "using Rule 15 to make the complaint 'a moving target,' to 'salvage a lost cause by untimely suggestion of new theories of recovery,' [or] to present 'theories seriatim' in an effort to avoid dismissal." *Minter*, 451 F.3d at 1206 (quoting *Viernow v. Euripides Dev. Corp.*, 157 F.3d 785, 800 (10th Cir. 1998), *Hayes v. Whitman*, 264 F.3d 1017, 1027 (10th Cir. 2001), and *Pallottino v. City of Rio Rancho*, 31 F.3d 1023, 1027 (10th Cir. 1994)). Nor will the Court penalize Plaintiff for omitting allegations from a state court filing that are not necessary to meet the state court's more lenient pleading requirements, especially when Plaintiff sought the Court's leave to add these allegations less than two months after Defendants removed his First Amended Complaint to this Court. *See In re Thornburg Mortg., Inc. Secs. Litig.*, 265 F.R.D. 571, 582 (D.N.M. 2010) (finding that a proposed amendment made four months after learning of a potential standing defect in the operative complaint was not unduly delayed).

8

B.  UNDUE PREJUDICE

The Proposed Second Amended Complaint is not unduly prejudicial to Defendants.  "Courts typically find prejudice only when amendment unfairly affects the defendants 'in terms of preparing their defense to the amendment.'"  *Minter*, 451 F.3d at 1208 (quoting *Patton v. Guyer*, 443 F.2d 79, 86 (10th Cir. 1971)).  This unfairness occurs most often "when the amended claims arise out of a subject matter different from what was set forth in the complaint and raise significant new factual issues."  *Id.* (citations omitted).

Plaintiff's proposed Second Amended Complaint has none of these flaws.  It does not plead additional claims, add additional parties, articulate a new theory of liability, or allege significant new factual occurrences.  *See generally doc. 14*.  Rather, it pleads statistical evidence about the prevalence of suicide in prison and provides additional detail for the policy violations alleged in the First Amended Complaint by specifying which policies were operative at the time of Mr. Armijo's death and which policies were violated by SCDC employees.  *Id.* at 7.  Adding these additional details to the operative Complaint at this stage of litigation does not materially affect Defendants' ability to defend against them.  Defendants have not yet answered the operative First Amended Complaint nor started discovery in this Court on the facts alleged therein.  Furthermore, the First Amended Complaint already requires Defendants to defend against the specific policy violations proposed in the Second Amended Complaint

because refuting the allegation therein that SCDC employees violated unspecified

SCDC policies with respect to Mr. Armijo requires Defendants to identify which SCDC

policies for suicide prevention were operational at the time of Mr. Armijo's death and

whether SCDC employees' conduct violated them.

### C.  BAD FAITH

Plaintiff's Second Amended Complaint is not proposed in bad faith.  Bad faith

"can be inferred if the proposed amendment directly contradicts allegations made in the

original pleading, such that the original and amended factual accounts cannot be

reconciled," or "if a party seeks leave to amend for an improper purpose."  *Rivera v.*

*Volvo Cars of N. Am., LLC*, Civ. No. 13-00397 KG/KBM, 2015 WL 12860553, at *4 (D.N.M.

Feb. 9, 2015) (unpublished) (quoting *Colo. Civil Rights Comm'n v. 1950 Logan Condos.*

*Condo. Ass'n*, Civil Action No. 13-cv-02583-PAB-MJW, 2013 WL 6858703, at *1 (D. Colo.

Dec. 30, 2013) (unpublished)).

The only improper purpose alleged by Defendants is that Plaintiff is using the

amendment process to frustrate their pending dispositive motions.  *Doc. 21* at 7–8.

However, courts commonly permit amendments to complaints even after determining

that the operative complaint fails to state a claim.  *See, e.g., B.T. ex rel. G.T. v. Santa Fe*

*Pub. Sch.*, No. CIV-05-1165 JB/RLP, 2007 WL 1306814, *2–3 (D.N.M. Mar. 12, 2007)

(unpublished).  This practice honors the preference to have claims decided upon their

merits rather than by the technicalities of pleadings.  *See Minter*, 451 F.3d at 1204 ("The

purpose of … Rule [15] is to provide litigants 'the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties.'" (quoting *Hardin v. Mantiowoc-Forsythe Corp.*, 691 F.2d 449, 456 (10th Cir. 1982)).

Admittedly, repeated motions to amend which repeatedly move the target for dispositive motions could be considered as made for an "improper purpose."  But the instant motion does not create that inference.  The motion is made early in the federal litigation and is the first in response to a dispositive motion in this venue.  Even considering the earlier pleading amendment when the case was in state court does not create the record necessary to establish bad faith.  *Cf. Allen v. Menninger Clinic, Inc.*, Nos. Civ.A. 98-2373-GTV, Civ.A. 98-2404-GTV, 1999 WL 381560, at *2 (D. Kan. May 25, 1999) (unpublished) (expressly declining to "conclude that [the] plaintiff's attempt to tailor her complaint around [a] pending motion to dismiss amounts to bad faith" despite the pendency of the case in federal court for five months, the passage of the pleading amendment deadline, and the fact that plaintiff was seeking to file a third amended complaint).[1]

---

[1] Defendants cite *Myers v. Hummel*, No. 11-cv-00400-KMT-KLM, 2012 WL 1020519, (D. Colo. Mar. 26, 2012) as a similar case in which a district court denied leave to amend.  *See doc. 21* at 8.  The case, however, is not as similar as Defendants claim nor did the district court there find any bad faith.  In *Myers*, the plaintiff sought leave from the District Court of Colorado to amend his complaint to add another claim after the case had been pending for almost a year, the parties had proceeded through discovery, the pleading amendment deadline had passed, and the defendant had moved for summary judgment.  2012 WL 1020519 at *6.  The District Court of Colorado denied leave to amend because amendment was unduly delayed, unduly prejudicial, and futile and expressed concern in its undue delay analysis that the plaintiff was attempting to make his complaint a moving target by not moving to amend until the defendant had moved for summary judgment.  *Id.* at *6–8.  Here, by contrast, Plaintiff does not plead a new theory of liability and has moved the Court to amend early in the litigation process in this

D. FUTILITY

Based on the record before the Court, amendment is not futile.  Futility exists

where "the proposed amended complaint would be subject to dismissal for any reason,

including that the amendment would not survive a motion for summary judgment."

*E.Spire Commc'ns, Inc. v. N.M. Pub. Regulation Comm'n*, 392 F.3d 1204, 1211 (10th Cir.

2004) (quoting *Bauchman ex rel. Bauchman v. W. High Sch.*, 132 F.3d 542, 562 (10th Cir.

1997)).  Defendants make two arguments for futility.  First, they contend that certain

facts alleged in the putative amended complaint are provably inaccurate.  Second, they

assert that the amendments would not bring the claim within the TCA as argued in

their pending motion to dismiss.  *Doc. 21* at 5-6.  The Court rejects both arguments.

1. *The Dispute over the Allegations in Plaintiff's Proposed Second Amended Complaint*
   *Do Not Establish the Futility of the Proposed Amendment*

Plaintiff's Proposed Second Amended Complaint repeatedly references the 2016

SCDC SOPPs as they relate to suicide prevention policies within SCDC.  *Doc. 14* at 7–10

¶¶ 14–18, 42–43.  Defendants contend that SCDC had not yet adopted these SOPPs at

the time of Mr. Armijo's death.  *Doc. 21* at 2, 5–6; *doc. 38* at 5, 8.  Therefore, they argue

that the reliance of the proposed amended complaint on these "policies" renders it

immediately subject to summary judgment.  The argument is flawed for two reasons.

---

Court, before the start of discovery in this Court, and within the amended deadline.  These distinctions
diminish any concern that Plaintiff is making his complaint a moving target by filing it after Defendants
filed their motion to dismiss.

First, based on the record before it, the Court cannot find there is no genuine issue of material fact as to whether the 2016 SOPPs were the effective policies regarding suicide prevention. Even accepting that the 2016 SCDC SOPPs had not been formally adopted by the County Commission, there remains some dispute over whether they were the *de facto* SOPPs being utilized by the management of the detention center. *See doc. 38* at 2.

More fundamentally, the Court is unpersuaded that violations of the particular 2016 SOPPs as alleged in the proposed amended complaint are necessary for Plaintiff's claims to fall within a TCA waiver. Indeed, even if the relevant 2016 SOPPs were not formally or informally in effect, Plaintiff contends that the 2000 SOPPs, which all agree preceded the 2016 SOPPs, were similarly violated. *Id.* Moreover, Plaintiff may be able to present evidence at the summary judgment stage that, given the circumstances in a detention setting, having inadequate suicide prevention policies constitutes "an unsafe, dangerous, or defective condition on property owned and operated by the government operating dangerous condition." *Encinias v. Whitener Law Firm, P.A.*, 310 P.3d 611, 616–17 (N.M. 2013) (quoting *Castillo v. Cnty. of Santa Fe*, 755 P.2d 48, 50–51 (N.M. 1988)). Consequently, at this stage, the possibility that Plaintiff's Amended Complaint cites to SOPPs which were not yet effective does not render it futile.

2. *Section 41-4-6 Waives Defendant BCCCS' Immunity for the Negligence Alleged in Count I of Plaintiff's Proposed Second Amended Complaint*

Count I of Plaintiff's Proposed Second Amended Complaint is not subject to dismissal on its face since it falls within the ambit of the waiver for negligent operation and maintenance of a public building in Section 41-4-6 of the TCA.[2]  The New Mexico Legislature passed the TCA in response to the New Mexico Supreme Court abolishing the common law doctrine of sovereign immunity thereby permitting tort actions to be maintained against governmental entities and public employees.  *See Cole v. City of Las Cruces, N.M.,* 657 P.2d 629, 630 (N.M. 1983).  It sought to balance "the inherently unfair and inequitable results which occur in the strict application of the doctrine of sovereign immunity" with the recognition that "government should not have the duty to do everything that might be done" as there is almost no limit to the area within which it

---

[2] Count I of Plaintiff's Proposed Second Amended Complaint alleges negligence by SCDC, which is not party to this case.  *Doc. 14* at 10–12 ¶¶ 45–62.  The Court infers that Defendant BCCCS is the intended Defendant for these allegations because Defendant BCCCS was the only Defendant named in Plaintiff's original Complaint for Wrongful Death, *see doc. 1-1,* and the allegations in Count I of the Proposed Second Amended Complaint are almost identical to those raised in the Complaint for Wrongful Death, *compare doc. 14* at 10–12 ¶¶ 45–62 *with doc. 1-1* at  ¶¶ 23–40.

   The Court notes some tension between the TCA's textual architecture for a governmental entity's liability and the tort of negligence that Plaintiff asserts against Defendant BCCCS.  The TCA's text limits the liability of a governmental entity like Defendant BCCCS to *respondeat superior* and statutory indemnification of liable public employees.  *See Abalos v. Bernalillo Cnty. Dist. Att'y's Office,* 734 P.2d 794, 798–99 (N.M. Ct. App. 1987) (citing *Silva v. New Mexico,* 745 P.2d 380, 385 (N.M. 1987) and N.M. Stat. Ann. §§ 41-4-4(B) through (D)).  Based on the TCA's text, a governmental entity has immunity from tort liability except as waived in N.M. Stat. Ann. §§ 41-4-5 through 41-4-12.  *See Bierner v. City of Truth or Consequences,* 96 P.3d 322, 324 (N.M. Ct. App. 2004); N.M. Stat. Ann. § 41-4-4.  None of these statutes waives immunity for negligence by a governmental entity; rather they each waive immunity for liability arising from certain forms of negligence by public employees.  *See* N.M. Stat. Ann. §§ 41-4-4 through 41-4-12.  Nonetheless, the New Mexico Supreme Court has long analyzed governmental entities' liability under a theory of negligence rather than *respondeat superior*.  *See, e.g., Upton v. Clovis Mun. Sch. Dist.,* 141 P.3d 1259, 1265 (N.M. 2006) (assessing a school district's liability under a negligence theory); *Espinoza v. Town of Taos,* 905 P.2d 718, 720–22 (N.M. 1995) (same but for a municipality); *Castillo v. Cnty. of Santa Fe,* 755 P.2d 48, 49-51 (N.M. 1988) (same but for a county agency).  Thus, the Court must consider the allegation of negligence against Defendant BCCCS proper.

has the power to act.  *Cobos v. Dona Ana Cnty. Hous. Auth.*, 970 P.2d 1143, 1145 (N.M.

1998); N.M. Stat. Ann. § 41-4-2.

To achieve this balance, the New Mexico Legislature restored general tort

immunity for government entities and public employees but subjected it to waiver in

certain, defined circumstances.  *Cobos*, 970 P.2d at 1145.  "In each of these waivers the

Legislature identified a specific existing duty on the part of public employees, which, if

breached, could result in liability based upon the traditional tort concepts of duty and

the reasonably prudent person's standard of care in the performance of that duty."  *Id.*

(internal quotations and citations omitted).  Therefore, when asserting a tort claim

against a public employee or a governmental entity, it is not enough to plead the

elements of negligence.  The alleged negligence must fall within the scope of a waiver

for the complaint to state a claim for relief.  *Id.* at 1150; *Kreutzer v. Aldo Leopold High Sch.*,

409 P.3d 930, 940 (N.M. Ct. App. 2017).

> i.   PLAINTIFF'S PROPOSED SECOND AMENDED COMPLAINT ESTABLISHES THE
>       UNSAFE CONDITION NEEDED TO WAIVE IMMUNITY UNDER SECTION 41-4-6

The negligence alleged in Count I of Plaintiff's Proposed Second Amended

Complaint falls within the scope of Section 41-4-6's waiver.[3]  Section 41-4-6 waives

---

[3] The Court need not and so does not reach the issue of whether Section 41-4-10 of the TCA applies to the negligence alleged in Count I since the negligence asserted therein need only fall under the scope of one TCA waiver to state a claim.  The Court, however, is skeptical that this waiver applies to the negligence pled in Count I since none of the public employees purported to have acted negligently with respect to Mr. Armijo is alleged to be licensed by the State of New Mexico or permitted by law to provide services related to those provided by physicians, hospitals, and related health care practitioners.  *See M.D.R. v. New Mexico ex rel. Hum. Servs. Dep't*, 836 P.2d 106, 108 (N.M. Ct. App. 1992).  It is possible that some

immunity for "liability for damages resulting from … wrongful death … caused by the negligence of public employees while acting within the scope of their duties in the operation or maintenance of any building, public park, machinery, equipment or furnishings." N.M. Stat. Ann. § 41-4-6(A). The New Mexico Supreme Court "interpret[s] Section 41-4-6(A) broadly to waive immunity 'where due to the alleged negligence of public employees an injury arises from an unsafe, dangerous, or defective condition on property owned and operated by the government." *Encinias*, 310 P.3d at 616–17 (quoting *Castillo*, 755 P.2d at 50–51). It has cautioned, however, that immunity is not waived for a condition that only endangers the eventual victim. *See Upton v. Clovis Mun. Sch. Dist.*, 141 P.3d 1259, 1261 (N.M. 2006); *Archibeque v. Moya*, 866 P.2d 344, 348 (N.M. 1993). The dangerous condition must "threaten[] the general public or a class of users of the building." *Upton*, 141 P.3d at 1261 (citing *Espinoza v. Town of Taos*, 905 P.2d 718, 721 (N.M. 1995), and *Castillo*, 755 P.2d at 51).

The dangerous condition does not have to arise from the physical aspects of a public building or its surrounding grounds. *Upton*, 141 P.3d at 1261. Rather, it may be the presence of dangerous actors on public property. *Encinias*, 310 P.3d at 617–19 (violent students in a parking area near a school where students congregated); *Castillo*,

---

SCDC employees are licensed by the State of New Mexico or permitted by law to provide health care services. However, the factual allegations proposed in Count I of Plaintiff's Second Amended Complaint do not appear to allege or support the reasonable inference that Defendant Pargas, Defendant Diaz, SCDC Investigator Duffy, SCDC Administrative Assistant O'Neill, or any other SCDC employee alleged to have act or failed to act with respect to Mr. Armijo had either of these credentials.

755 P.2d at 49–51 (roving dogs in a public housing complex); *Callaway v. N.M. Dep't of Corr.*, 875 P.2d 393, 399 (N.M. Ct. App. 1994) (roaming gang members in a prison's recreation area).  It may also be deficiencies in "safety policies necessary to protect the people who use the building" or general noncompliance with these policies.  *Upton*, 141 P.3d at 1261–63 (failure to follow appropriate emergency protocols and an individualized safety protocol established for an asthmatic student).

Most relevant for the instant case, while a claim premised solely on negligent supervision does not fall within the waiver, Section 41-4-6 does waive immunity for a failure of supervision where it is "tied directly to the operation of [a] building."  *Upton*, 141 P.3d at 1264.  Reviewing New Mexico caselaw demonstrates the key question which dictates the distinction: Is the public premise ordinarily dangerous in the absence of the supervision that the plaintiff claimed was lacking?  *Compare Kreutzer*, 409 P.3d 930 at 944 *and Espinoza*, 905 P.2d at 722 *with Leithead v. City of Santa Fe*, 940 P.2d 459, 463–65 (N.M. Ct. App. 1997) *and Prewitt v. Los Lunas Sch. Bd. of Ed.*, 2020 WL 3078505, at *4 (N.M. Ct. App. June 9, 2020) (unpublished); *see also Seal v. Carlsbad Indep. Sch. Dist.*, 860 P.2d 743, 746–47 (N.M. 1993).

In *Espinoza* and *Kreutzer*, New Mexico Courts found that Section 41-4-6 does not waive immunity for negligent supervision if the premises being supervised is not reasonably known to be dangerous absent the supervision.  In *Espinoza*, a child, who was attending a town summer camp, was injured when he fell from a playground slide

when the camp employees were inattentive.  905 F.2d at 719.  The New Mexico Supreme Court held that the negligent supervision claim did not fall within the waiver because "[t]he playground was a safe place for children[;] … [it], particularly the slide, was not a condition requiring supervision." *Id*. at 722.  In *Kreutzer*, a student was assaulted by another student in the parking lot of the school.  409 P.3d at 931.  The assaulted student argued that her claim was not based on negligent supervision but on the school's "failure to have an appropriate written policy for student safety in its parking lot and its failure on the day of the incident to follow an informal policy of having the parking lot monitored by a staff member." *Id*. at 934.  The New Mexico Court of Appeals rejected this argument as a ground for the Section 41-4-6 waiver because plaintiff failed to present evidence of: (1) "a dangerous condition in the school parking lot;" (2) that the defendant school "knew or should have known that the parking lot was unsafe;" or (3) that the school "knew or should have known that [the assailant] had a propensity for violence or posed a threat to [the victim] (or to anyone at the school)." *Id*. at 944.  In short, because the school had no reason to be aware of a dangerous condition in the parking lot, either based on its intrinsic characteristics or the persons present there, the New Mexico Court of Appeals found that plaintiff's claim was one solely based on negligent supervision and thus barred by immunity.

    In contrast, in *Leithead* and *Prewitt*, the New Mexico Court of Appeals found waiver for negligent supervision since the premises supervised were reasonably known

18

to be dangerous absent adequate supervision.  In *Leithead*, the court tackled whether a claim based on the "negligent provision of lifeguard services at a public swimming pool" fell within the Section 41-4-6 waiver.  940 P.2d at 460.  The parents of a six-year-old girl who drowned in a municipal swimming pool sued the city alleging that "when City lifeguards did not adequately perform duties that were essential to public safety, they negligently operated the swimming pool and thereby created a condition on the premises that was dangerous."  *Id.* at 462.  The defendant city argued that this claim was based on negligent supervision and thus barred by immunity as in *Espinoza*.  *Id.* at 461-62.  The court rejected this argument and found that the plaintiff had raised "a claim for negligent 'operation and maintenance'" because "[a] swimming pool without an adequate number of trained lifeguards creates a dangerous condition on the physical premises which affects the swimming public at large."  *Id.* at 462–63.  Elaborating on its holding, the court emphasized that "lifeguard services are so essential to the safety of a swimming pool that they seem akin to other kinds of safety equipment, such as lifelines and ladders, that are fundamental in making the premises reasonably safe for the swimming public."  *Id.* at 463.  It also clarified that the applicability Section 41-4-6 waiver did not turn on the presence or absence of lifeguards, because "[t]he presence of lifeguards in adequate numbers but who are inattentive or careless in performing their duties makes the premises no less dangerous and gives rise to a situation from which the jury could reasonably determine that the City negligently operated the pool."  *Id.* at

464–65.  *Leithead*, therefore, stands for the proposition that both the absence of lifeguards and negligent supervision by lifeguards amount to "a condition on the premises that creates a potential risk to the general public, which is the essential ingredient to liability under the [TCA]."  *Id*. at 465 (internal quotation marks and citation omitted).

In *Prewitt*, a student was exercising using weights without a spotter in the school's weight room, and the weight slipped and crushed his finger.  2020 WL 3078505, at *1.  In his subsequent lawsuit, the student "alleged that the safe operation of the weight room required that spotters be used while student athletes were operating or using various free weight equipment."  *Id*. (internal brackets and ellipses omitted).  The student further claimed that the school had a practice of failing to provide spotters despite its posted rules for the weight room requiring them.  *Id*.  The defendants argued that the student's claim was one for mere negligent supervision which did not fall within the Section 41-4-6 waiver.  *Id*.  To resolve this dispute, the New Mexico Court of Appeals compared *Espinoza* with *Leithead*.  *Id*. at *2-*4.  It found that the weight room was more akin to the swimming pool in *Leithead* than the playground in *Espinoza* because the "weight room – according to [the p]laintiff's allegations and [the d]efendants' admissions[4] – could not be safely operated without spotters, and therefore,

---

[4] This admission came in the defendants' answer.  *See Prewitt v. Los Lunas Schs. Bd. of Ed.*, 2020 WL 3078505, *4 (N.M. Ct. App. June 9, 2020).

[the d]efendants' failure to provide spotters arguably created a dangerous condition affecting all student athletes using the facility." *Id.* at *4. For this reason, the court "conclude[d that the p]laintiff's allegations present more than a claim for mere negligent supervision but rather a claim for negligent failure to provide services necessary to safely operate a weight room—a claim which falls within the waiver provision of Section 41-4-6." *Id*.

Thus, this Court now turns to the question of whether the allegations in Plaintiff's Second Amended Complaint and reasonable inferences therefrom are more like the playground in *Espinoza* and the parking lot in *Kreutzer* or the swimming pool in *Leithead* and the weight room in *Prewitt*. The Court concludes the latter.

Plaintiff's Proposed Second Amended Complaint supports the reasonable inference that SCDC, as a prison, is dangerous to prisoners with suicidal ideations if it fails to implement reasonable procedures to identify such prisoners and supervise them once identified. It alleges that "[s]uicide is the leading cause of death in jails in the United States …." *Doc. 14* at 6 ¶ 11. It can be reasonably inferred that the cause of such deaths is the unique circumstances present in a detention facility. Detention centers hold people facing criminal charges or a criminal sentence. The stress of such a circumstance is enhanced by being separated from friends and family and other support networks. Detained individuals are held among people that they do not know and may have good reason not to trust. Detained individuals are also completely

21

dependent upon prison staff for medical and/or psychological treatment.  This set of circumstances poses a unique danger to people experiencing suicidal ideation. Moreover, based on the allegations about the suicide risk and the existence of relevant SCDC policies for mitigation of that risk, it appears this danger was known to (or should have been known to) Defendants.  Consequently, this case is similar to *Leithead* and *Prewitt* in that "Plaintiff's allegations present more than a claim for mere negligent supervision but rather a claim for negligent failure to provide services necessary to safely operate a [detention center]."  *Prewitt*, 2020 WL 3078505 at *4.

Given the dispute over the allegations in Plaintiff's Proposed Second Amended Complaint, the Court highlights that this conclusion is not premised upon Plaintiff establishing the violation of a particular set of SOPPs.  In *Leithead* and *Prewitt*, the existence of relevant policies which were violated by the respective defendant was not the crux of the courts' conclusions.  Instead, in each case, the court concluded that the premise was a dangerous condition in need of supervision outside of the particular policies in effect.  The existence/violation of the policies was used primarily to buttress the conclusion that the respective defendant knew about the danger.  Consequently, even if the 2016 SOPPs alleged by Plaintiff were not in effect, his claim may still be viable if the 2000 SOPPs address the mitigation of suicide risk or if Plaintiff can establish that the absence of any SOPP on the matter disregarded a danger of which Defendants should have reasonably known.

Plaintiff's claim as alleged in the Proposed Second Amended Complaint can also

survive under the theory for the Section 41-4-6 waiver espoused in *Upton*.  *See* 141 P.3d

at 1261–63; *cf. Kreutzer*, 409 P.3d at 933-34 (finding no waiver under a more

straightforward dangerous condition theory and that the "[p]laintiffs also [could not]

establish waiver under *Upton* … because *Upton* requires multiple safety policy

failures").  In *Upton*, the parents of a student, who died from an asthma attack after a

substitute physical education ("PE") teacher did not exempt her from PE class, sued the

school for negligence under a Section 41-4-6 waiver theory.  As the *Upton* court

explained:

> The [plaintiffs] claim[ed] the [Defendant] School District negligently put
> in motion a chain of events that both preceded and followed the specific
> decisions of the hapless substitute teacher.  The school failed to
> implement [the asthmatic student's individualized education plan[5]], to
> respond appropriately to the specific information it was given about [the
> student's] condition, and to implement the specific assurances given to
> the [plaintiffs] about the care the school was to provide in light of [the
> student's] special needs.  The substitute teacher, a school employee,
> forced [the student] to continue her exercise despite tangible evidence of
> her distress.  Then, the school failed to properly implement its emergency
> procedures.  Faced with [the student's] acute distress, the school never
> administered CPR, no one called 911 in a timely manner, [the student]
> was simply wheeled outside to await emergency personnel.

141 P.3d at 1263–64.  On these facts, the *Upton* court concluded that the plaintiffs'

"challenge [to] the School District's general failure to implement promised safety

---

[5] An IEP is an agreement between parents of a child with special needs and educators specifying certain educational goals and the special services that this child requires.  *Upton*, 141 P.3d at 1260.

policies for at-risk students" "assert[ed] much more than negligent supervision of their

daughter." *Id*. at 1263.  As the *Kreutzer* court noted, the *Upton* theory of Section 41-4-6

waiver was predicated on several facts which included: an individual with special

medical needs, an institution that had been advised of those needs and knew how to

address them, and multiple safety policy failures which led to harm.  409 P.3d at 947.

    The facts alleged in the Proposed Second Amended Complaint fit into the *Upton*

paradigm:  Mr. Armijo had special medical needs; SCDC was advised of those needs

and had policies designed to address those needs; and on several occasions SCDC

employees failed to follow those policies, resulting in harm.  *Doc. 14* at 3–5 ¶¶ 22–25,

28–42.  Consequently, at this stage, Plaintiff's proposed amended complaint is also not

futile under the *Upton* theory for the Section 41-4-6 waiver.  *See, e.g., Rave v. Bd. of*

*Comm'rs for Cnty. of Bernalillo*, No. CIV 17-636 RB/LF, 2017 WL 3600452, *10 (D.N.M.

Aug. 18, 2017) (unpublished) (finding that a dangerous condition arose in a prison from

prison employees' multiple failures to apply policies for prisoners with medical needs

to a prisoner who they knew had chronic disease); *Kretek v. Bd. of Cnty. Comm'rs of Luna*

*Cnty.*, No. CIV 11-676 RB/GBW, 2013 WL 12039991, at *5 (D.N.M. Aug. 29, 2013)

(unpublished) (finding that a dangerous condition arose in prison from prison

employees' failure to apply policies for mentally ill and intoxicated prisoners to a

prisoner who they knew was high on methamphetamine).

ii.   DEFENDANTS' ARGUMENTS FOR THE INAPPLICABILITY OF SECTION 41-4-6
ARE UNCONVINCING

Defendants raise several arguments in briefing and oral argument for the

inapplicability of the Section 41-4-6 waiver.[6]  In their briefing, they primarily contend

"that the alleged acts or omissions … only could have presented a dangerous condition

for Plaintiff, and not the general population" because a "discrete health risk does not

'rise to the level of a dangerous condition on the premises of the penitentiary.'"  *Doc. 4*

at 8 (quoting *Williams v. Bd. of Regents of Univ. of N.M.*, 20 F. Supp. 3d 1177, 1195

(D.N.M. 2014), and *Lymon v. Aramark Corp.*, 728 F. Supp. 2d 1222, 1267 (D.N.M. 2010)).

The Court is unpersuaded that the analyses in these decisions supports a finding

of no Section 41-4-6 waiver in the instant case.  The *Lymon* Court cites a concurrence by

Chief Judge Ransom in *Archibeque v. Moya*, 866 P.2d 344 (N.M. 1993), for the proposition

that a misclassification or other decision with respect to a prisoner must raise security

risks—as opposed to health risks—and grounds its Section 41-4-6 analysis in a

distinction between administrative and non-administrative functions.  *Lymon*, 728 F.

Supp. 2d at 1266–68 (citing *Archibeque*, 866 P.2d at 350).  The *Williams* Court cites *Lymon*

for this same proposition.  *See Williams*, 20 F. Supp. 3d at 1194–95 (citing *Lymon*, 728 F.

---

[6] The Court draws some of Defendants' arguments from their motion to dismiss and their reply to Plaintiff's response to that motion and transfers them to Plaintiff's Proposed Second Amended Complaint.  While Defendants did not incorporate these briefs by reference into their response to Plaintiff's motion to amend, the Court considers it proper to discuss specific arguments Defendants made as to Plaintiff's First Amended Complaint as they likely inform its broad contention that the additional allegations proposed in Plaintiff's Section Amended Complaint do not bring the Complaint within the ambit of Section 41-4-6.  *See doc. 21* at 6.

Supp 2d. at 1266).  The evolution of New Mexico caselaw has left both the

administrative-function inquiry and the health-safety distinction in Chief Judge

Ransom's concurrence behind.  Since *Archibeque*, New Mexico Courts have emphasized

that Section 41-4-6 should not be interpreted or applied more restrictively "based solely

on a party's status as a prison inmate."  *Callaway*, 875 P.2d at 398–99.  They have also

clarified that assessment of the existence a dangerous condition is the appropriate lens

for the applicability of the Section 41-4-6 waiver and that this dangerous condition may

be a health risk that does not arise from some physical aspect of a public premises.  *See*

*Encinias*, 310 P.3d at 616; *Upton*, 141 P.3d at 1261.  Finally, to the limited extent that the

Court finds the Section 41-4-6 analysis in *Williams* and *Lymon* persuasive, the situation

at bar is distinct from the situations therein as it involves the negligent care for, rather

than classification of, a suicidal prisoner.  Unlike *Williams* and *Lymon*, Plaintiff's

Proposed Second Amended Complaint contains no allegations with respect to SCDC

employees' classification of Mr. Armijo.[7]  *See generally doc. 14* at 5–14.

---

[7] To the extent that Defendants argue that SCDC employees' negligent care for Mr. Armijo is a product of misclassifying him as a prisoner without special medical needs, *see doc. 4* at 7; *doc. 38* at 4–6, their argument exemplifies the sponginess of the classification inquiry and why New Mexico Courts have replaced it with the dangerous condition inquiry.  Nearly all negligent treatment of persons with special medical or security needs may be recast as the negligent classification of these persons as individuals without special needs.  Negligent care for the asthmatic student in *Upton* could have been redefined as negligently classifying her as a student without special health needs.  To the extent that misclassification remains an appropriate analytical lens, Defendants may not manipulate it to relabel, as negligent classification, SCDC employees' multiple, alleged failures to take appropriate responsive measures upon receiving notice that Mr. Armijo was suicidal when Plaintiff does not expressly allege misclassification in his Proposed Second Amended Complaint.

Defendants also contend in briefing and during oral argument that "[i]n the prison context, … the operation and maintenance of the penitentiary premises, as these terms are used in § 41-4-6, does not include the security, custody, and classification of inmates" and other "administrative function[s] associated with the operation of the corrections system." *Doc. 4* at 6–7 (quoting *Williams*, 20 F. Supp. 3d at 1187); *see also id.* at 7–8 (citing *Archibeque*, 866 P.2d at 347, *Lymon*, 728 F. Supp. 2d at 1266, and *Herrera v. Dorman*, Civil No. 13-1176 MV/SCY, 2014 WL 7653393 (D.N.M. Aug. 5, 2014)); *doc. 23* at 2–4; *doc. 38* at 4–6.  This contention, however, misidentifies the gravamen of the inquiry. The applicability of Section 41-4-6 in the prison context turns not on whether prison employees' acts and omissions are administrative in nature but rather on whether prison employees exercise reasonable care to prevent and correct dangerous conditions in prison.  *See Archibeque*, 866 P.2d at 348; *Callaway*, 875 P.2d at 398–99 (declining "to interpret or apply Section 41-4-6 more restrictively based solely on a party's status as a prison inmate").  The Court has already concluded that Plaintiff's allegations sufficiently establish a dangerous condition under both the logic of *Leithead* and *Upton.*

Defendants also maintain in briefing and oral argument that the allegations proposed in Plaintiff's Second Amended Complaint are insufficient to establish that anyone other than Mr. Armijo was harmed or endangered by the acts and omissions of SCDC employees.  *Doc. 23* at 5 (citing *Lessen v. City of Albuquerque*, 187 P.3d 179, 184–85 (N.M. Ct. App. 2008)); *doc. 38* at 5.  *Lessen* is distinguishable from the situation at bar.

There, a wrongful death estate sued a municipality operating a rural prison after a prisoner suffering from heroin withdrawals wandered into the desert and died of hypothermia subsequent to prison employees releasing him and three other prisoners from the prison without ensuring that any of them had a ride, a violation of the prison's transportation policy. *Lessen*, 187 P.3d at 180–81. The New Mexico Court of Appeals held that Section 41-4-6 did not apply to the wrongful death estate's negligence claims since the prison was not "located so far from civilization that the absence of transportation posed a danger to the population of released inmates" such that the violations of the prison's transportation policy amounted to a dangerous condition for all released prisoners. *Id.* at 184.

Here, by contrast, SCDC, as a prison, cannot be operated safely as to suicidal prisoners without appropriate supervision of these prisoners or compliance with appropriate policies for their identification and care such that SCDC employees' failures to supervise Mr. Armijo appropriately and follow appropriate safety policies as to Mr. Armijo put all suicidal prisoners at risk. *See Rave*, 2017 WL 3600452, at *10 (finding that Section 41-4-6 applied to allegations of prison policies violations as to a single prisoner "relate[d] to a 'class of building users'—incarcerated inmates with medical issues— because the policies were "necessary to protect ill inmates"); *Upton*, 141 P.3d at 1265 (holding that school employees' failures to follow safety policies for an asthmatic student "created a dangerous condition for all special-needs children" since their

28

"indifference towards [the asthmatic student's] special medical needs makes it more

likely that all similarly situated students were at risk as well").

       iii.   A TORT VICTIM'S SELF-HARM DOES NOT PRECLUDE THE APPLICATION OF
            THE SECTION 41-4-6 WAIVER.

Defendants' final argument is that the TCA does not waive immunity for self-

harm.  *See doc. 4* at 9–10 (citing *Amirault v. City of Roswell*, No. 6:95-CV-422 MV/RLP,

1996 WL 391986, at *13 (D.N.M. July 11, 1996)); *doc. 23* at 4; *doc. 38* at 5–6.  Indeed, the

*Amirault* court stated that "with particular regard to law enforcement officers, it is clear

that immunity is not waived under [the TCA] for self-inflicted injury, which is the

linchpin of this case."  1996 WL 391986, at *13 (citation omitted).  However, for this

proposition, the court cited the waiver provision under N.M. Stat. Ann. § 41-4-12, *id.*,

which unlike 41-4-6, lists particular actions for which law enforcement officers can be

held liable, *see id.*; N.M. Stat. Ann. § 41-4-12 (waiving immunity for liability for injury

"resulting from assault, battery, false imprisonment, false arrest, malicious prosecution,

abuse of process, libel, slander, defamation of character, violation of property rights, the

independent tort of negligent spoliation of evidence or the independent tort of

intentional spoliation of evidence, failure to comply with duties established pursuant to

statute or law or any other deprivation of any rights, privileges or immunities secured

by the constitution and laws of the United States or New Mexico").

In *Amirault*, the officers had committed none of the aforementioned actions.

Instead, the plaintiff complained that the officers should have taken him into custody

prior to his independent attempt to commit suicide.  1996 WL 391986, at *1-*2.  The

*Amirault* court was correct that there was no waiver under Section 41-4-12 for this act of

self-harm.  However, the court said nothing about whether, for the purpose of the

Section 41-4-6 waiver, the bodily injury or death caused by negligence in the operation

or maintenance of a public building could be self-inflicted.  In fact, the New Mexico

Supreme Court has considered this question implicitly in *Silva v. New Mexico*, 745 P.2d

380 (N.M. 1987) and found that suicide does not preclude the application of the Section

41-4-6 waiver.  *See Silva*, 745 P.2d at 381, 385–86 (asserting that the § 41-4-6 waiver was

arguably applicable to the suicide of a state prisoner who did not receive care required

to prevent his suicide due to the failure of the New Mexico Department of Corrections

to have any facilities and staff capable of providing this care).[8]

## IV.    CONCLUSION

Granting Plaintiff leave to file his Proposed Second Amended Complaint is a

proper use of the Court's discretion since amendment is not futile, done in bad faith,

unduly delayed, or unduly prejudicial to Defendants.  Accordingly, IT IS HEREBY

---

[8] This issue may also implicate the question of duty to the extent that it is relevant to the scope of the
Section 41-4-6 waiver.  *Compare C.H. v. Los Lunas Sch. Bd. of Educ.*, 852 F.Supp.2d 1344, 1358-1366 (D.N.M.
2012) (analyzing 41-4-6 waiver by analyzing duty principles) *with Kreutzer.*, 409 P.3d at 940 ("We need not
reach the issue of duty unless we determine that the plaintff's cause of action is one for which immunity
has been waived." (internal brackets omitted) (quoting *Armijo v. Dep't of Health & Env't*, 775 P.2d 1333,
1334 (N.M. Ct. App. 1989)).  This wrinkle would not change the Court's conclusion as Defendants' duty
appears on the face of the complaint.  *See Johnstone v. City of Albuquerque*, 145 P.3d 76, 78–79, 83 (N.M. Ct.
App. 2006) ("Suicide is generally regarded as an intervening cause" that renders a tort victim's harm
unforeseeable absent "intentional conduct that creates the risk of suicide, or a legally recognized special
relationship and knowledge of a specific likelihood of harm.") .

ORDERED that Plaintiff's Motion to Amend Complaint (*doc. 14*) is GRANTED and that

Defendants' Motion to Dismiss (*doc. 4*) is DENIED as MOOT.  IT IS FURTHER

ORDERED that Plaintiff file his proposed Second Amended Complaint **within fourteen**

**(14) days of the issuance of this order** or forfeit the Court's leave to do so.

      **IT IS SO ORDERED.**

                          _____

                          GREGORY B. WORMUTH

                          UNITED STATES MAGISTRATE JUDGE

                          **Presiding by Consent**