IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

IVAN ARMIJO,

    Plaintiff,

v.                                                                   Civ. No. 20-355 GBW/GJF

BOARD OF COUNTY COMMISSIONERS
OF THE COUNTY OF SOCORRO, *et al.*,

    Defendants.

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court on Defendants' Motion for Qualified Immunity and Summary Judgment (the "Motion"). *Doc. 82*. Having reviewed the Motion, *doc. 82*, the attendant briefing, *docs. 92*, *96*, *102*, *103*, *113, 114*, and the supplemental briefing, *docs. 122*, *123*, *124*, *125*, having conducted a hearing on the Motion, *see doc. 126*, and being otherwise fully advised, the Court will GRANT Defendants' Motion.

**I.**    **BACKGROUND**

Plaintiff's claims arise from events surrounding the suicide of Edwin Armijo ("Armijo"), after Armijo was arrested on March 28, 2017 and while he was incarcerated at the Socorro County Detention Center ("SCDC") between March 29 and March 31, 2017. Plaintiff initially brought claims in state court under the Wrongful Death Act of New Mexico, *see doc. 1-1*, but he later amended his complaint to include federal claims,

1

*see doc. 1-2*.  On April 20, 2020, Defendants removed Plaintiff's First Amended Complaint for Wrongful Death to this Court.  *See doc. 1.*  On April 6, 2021, Plaintiff filed the operative Second Amended Complaint for Wrongful Death, bringing claims for: (1) negligence under the New Mexico Tort Claims Act against Defendant Board of County Commissioners of the County of Socorro (Count I); (2) violation of the Eighth and Fourteenth Amendments through 42 U.S.C. § 1983 against Defendant Mickaela Pargas ("Pargas") in her individual and supervisory capacities (Counts II and III); and (3) violation of the Eighth and Fourteenth Amendments through 42 U.S.C. § 1983 against Defendant Tommy Diaz ("Diaz") in his individual capacity (Count IV).  *See doc. 40* at 6-9.

On March 3, 2022, Defendants filed the instant Motion for Summary Judgment Based on Qualified Immunity in which they argue that Plaintiff's Section 1983 claims against Defendants Pargas and Diaz should be dismissed on the basis of qualified immunity.  *See generally doc. 82.*  Plaintiff filed a response on April 21, 2022, *doc. 92*, as well as two addendums to his response on April 26, 2022, and July 5, 2022, *docs. 96*, *102*.  Defendants filed a reply on July 8, 2022, *doc. 103*, and Plaintiff filed a surreply on August 2, 2022, *doc. 113*.  The Court held a hearing on the Motion on January 9, 2023.  *See doc. 126*.  Also on January 9, 2023, Plaintiff filed a Notice of Supplemental Authorities, *doc. 122*, and Defendants responded to this Notice on January 23, 2023, *doc. 124*.  After Plaintiff filed an additional Notice of Supplemental Authorities on January 25, 2023, *doc.*

*125*, the Motion was fully briefed and ready for decision.

## II.  LEGAL STANDARDS

### A. Summary Judgment

Under Federal Rule of Civil Procedure 56(a), this Court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of "show[ing] 'that there is an absence of evidence to support the nonmoving party's case.'" *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). Once the movant meets this burden, the non-moving party is required to designate specific facts showing that "there are . . . genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *see also Celotex*, 477 U.S. at 324.

In determining whether the movant has met its initial burden, the Court construes the facts in the light most favorable to the non-moving party. *See Scott v. Harris*, 550 U.S. 372, 377 (2007). In so doing, the Court must keep in mind three principles. First, the Court's role is not to weigh the evidence, but to assess the threshold issue of whether a genuine issue exists as to material facts requiring a trial. *See Liberty Lobby*, 477 U.S. at 249. "An issue is 'genuine' if there is sufficient evidence on

each side so that a rational trier of fact could resolve the issue either way. An issue of fact is 'material' if under the substantive law it is essential to the proper disposition of the claim." *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (internal citation omitted). Second, the Court must resolve all reasonable inferences and doubts in favor of the non-moving party and construe all evidence in the light most favorable to the non-moving party. *See Hunt v. Cromartie*, 526 U.S. 541, 550–55 (1999). Third, the court cannot decide any issues of credibility. *See Liberty Lobby*, 477 U.S. at 255. "[T]o survive the . . . motion, [the non-movant] need only present evidence from which a jury might return a verdict in his favor." *Id*. at 257. Nonetheless, at the summary judgment stage, "[the non-movant's] version of the facts must find support in the record." *Thomson v. Salt Lake County*, 584 F.3d 1304, 1312 (10th Cir. 2009).

### B. Qualified Immunity

Summary judgment motions based upon the defense of qualified immunity are reviewed differently from other summary judgment motions. *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009). Unlike a typical summary judgment motion, when a defendant asserts qualified immunity, the burden shifts first to the plaintiff to show that: "(1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Id*. (*citing Pearson v. Callahan*, 555 U.S. 223, 231–32 (2009)). If both parts of this "strict two-part test" are met, the burden shifts back to the defendant who must "show[] that there are no genuine issues of material fact and that he or she is

4

entitled to judgment as a matter of law." *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) (quoting *Nelson v. McMullen*, 207 F.3d 1202, 1205 (10th Cir. 2000)). If either part of the two-part test is not met, the defendant will prevail at summary judgment. The Court may address the two prongs of the test in any order. *Pearson*, 555 U.S. at 236.

The clearly established prong of the qualified immunity test requires the plaintiff to prove that the defendant violated a right which was clearly established by relevant legal precedent at the time the right was violated. In this circuit, the relevant precedent must come from the United States Supreme Court, the Tenth Circuit, or from the clearly established weight of authority from other courts. *Clark v. Wilson*, 625 F.3d 686, 690 (10th Cir. 2010). Although the plaintiff need not identify "a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). The dispositive question is whether, "at the time of the challenged conduct, 'the contours of a right are sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.'" *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (internal brackets omitted) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

### C. Individual Liability in Jail Suicide Cases

Claims against jail officials arising from a jail suicide are "treated as claims based on the failure of jail officials to provide medical care" under the Eighth Amendment.

*Cox v. Glanz*, 800 F.3d 1231, 1248 (10th Cir. 2015). A plaintiff must show that the jail official "act[ed] or fail[ed] to act with deliberate indifference to a substantial risk of serious harm to a prisoner." *Farmer v. Brennan*, 511 U.S. 825, 836 (1970). A finding of deliberate indifference requires that "both an objective and a subjective component" are met. *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000). Courts have established that death by suicide while incarcerated is "sufficiently serious" to meet the objective prong of the deliberate indifference test. *Estate of Burgaz v. Bd. of Cnty. Commisioners for Jefferson Cnty. Colo.*, 30 F.4th 1181, 1186 (10th Cir. 2022). By contrast, the subjective prong of the deliberate indifference test is a fact-specific inquiry and requires a showing that the defendant was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the defendant actually "dr[e]w the inference" that serious harm would occur. *Farmer*, 511 U.S. at 837.

For a claim against a jail official in her supervisory capacity, a plaintiff must show that there is an "affirmative link" between the supervisor and the prisoner's suicide. *See Perry v. Durborow*, 892 F.3d 1116, 1121 (10th Cir. 2018). A plaintiff can establish an affirmative link by showing personal involvement of the supervisor in the prisoner's suicide, causation, and state of mind. *Id.* A jail official has the requisite state of mind when she acts with deliberate indifference. *Id.* at 1122.

### III.   UNDISPUTED MATERIAL FACTS

Based on the record before it, the Court finds the following material facts to be undisputed for the purposes of this motion.[1]

1. After Armijo was arrested on March 28, 2017, he was taken to Presbyterian Hospital in Socorro and medically cleared for incarceration. Defendants' Undisputed Material Fact ("DUMF") 1.

2. Armijo was booked into the Socorro County Detention Center ("SCDC") on March 29, 2017, where he was asked questions pursuant to a booking questionnaire. DUMF 2.

3. In response to the booking questionnaire, Armijo denied any suicidal ideation and confirmed no history of past suicide attempts. DUMF 3.

4. Early on March 29, 2017, Emergency Medical Services ("EMS") personnel were called to evaluate Armijo at the jail after an incident in which Armijo threw his crutches at detention staff and was restrained. DUMF 6. After Armijo was evaluated by EMS, he signed a document refusing further medical treatment. *Id.*

5. Later on March 29, 2017, Defendant Diaz was informed by an inmate that she heard what sounded like an individual hitting their head against the wall in the adjacent cell (where Armijo was being held).[2] DUMF 7.

---

[1] Where the Court cites exclusively to one of Defendants' UMFs, it does so pursuant to Rule 56(e)(2), because the UMF in question was not specifically disputed in Plaintiffs' Response. *See* Fed. R. Civ. P. 56(e)(2). Where the Court cites to evidence in the record, it does so pursuant to Rule 56(c)(3), which permits consideration of "other materials in the record." Fed. R. Civ. P. 56(c)(3).

[2] Plaintiff disputes the exact wording of the description of the sound that the inmate provided to Defendant Diaz. *See doc. 92* at 10 ("In fact, Diaz was informed by a female in the adjoining cell that Mr.

6. After Defendant Diaz was informed by the inmate about the sound she heard in the adjacent cell, Defendant Diaz informed Defendant Pargas and another individual about the potential self-harm, head injury incident. DUMF 8. EMS were called to evaluate Armijo at the jail. DUMF 9. After Armijo was evaluated, Armijo signed a document refusing further medical treatment.[3] DUMF 10.

7. On March 30, 2017, Armijo reported to jail staff that he could not feel his legs. DUMF 12. After EMS was called for a third time to evaluate Armijo at the jail, Armijo was transported to the hospital. DUMF 13.

8. At the hospital, Armijo was diagnosed with numbness of foot, pain in left ankle and joint of left foot, and contusion of right hip. *Id.*; *see also doc. 82-1* at 17. Armijo was prescribed naproxen. *Doc. 82-1* at 17.

9. On the morning of March 31, 2017, Officer Diaz spoke with Armijo about judicial clearance for an upcoming medical appointment. DUMF 17.

10. That same morning, Officer Pargas spoke with Armijo about his charges, bond, and next court appearance. DUMF 18.

---

Armijo was running at the wall and slamming his head against it."). The Court does not find Defendants' and Plaintiff's proffered wordings to be materially different for purposes of its resolution of the instant Motion, because both wordings would have put Defendants on notice that Armijo was potentially engaging in self harm.

[3] Plaintiff disputes several aspects of Defendants' characterization of the EMS personnel's evaluation of Armijo after the head injury incident. *Doc. 92* at 11. Plaintiff argues broadly that because Defendants did not inform EMS that Armijo was potentially engaging in self harm, the EMS evaluation was limited to "potential injuries from a fall" and the treatment refusal that Armijo signed was "for the fall." *Id.* The Court agrees that there is a dispute concerning whether Defendants informed EMS that Armijo was potentially engaging in self harm. Thus, the Court finds undisputed only the facts that EMS personnel were called in response to the incident and that Armijo signed a form refusing further medical treatment.

11. Later in the morning of March 31, 2017, Armijo committed suicide in his jail cell. *Doc. 82-4* at 3.

12. Throughout Armijo's incarceration, Armijo's brother Roy called jail staff numerous times. *See doc. 92* at 56. During the first call, which took place on March 29, 2017, Roy informed Officer Tim O'Neill that Armijo was mentally unstable, that his wife had recently passed away, and that he had tried committing suicide and was suicidal. *Id*. Officer O'Neill relayed the information from the first call to Defendant Pargas. *Id*.

13. At some point during Armijo's incarceration but before his suicide, Defendant Pargas learned that Armijo had previously attempted suicide in a different jail. DUMF 30.

## IV. ANALYSIS

Defendants are entitled to summary judgment on the basis of qualified immunity because Plaintiff fails to meet his burden under the clearly established prong of the qualified immunity test. In particular, the Court finds that, at the time of Armijo's suicide, there was no clearly established law that would have put Defendants on notice that their actions constituted deliberate indifference to Armijo's serious risk of suicide, in violation of his right under the Eighth Amendment to medical care while incarcerated. Because a failure to meet one prong of the two-prong test for qualified immunity is dispositive at the summary judgment stage, the Court declines to address

the other prong which concerns whether Defendants violated one or more of Armijo's constitutional rights.

   i. *The Clearly Established Inquiry and Material Facts*

Qualified immunity protects officials as long as their actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78-79 (2017) (citations and internal quotation marks omitted). During the clearly established inquiry, the Court's task is to assess the material facts of the instant case and then compare those facts with the facts of other relevant cases in order to determine "if courts have previously ruled that *materially similar conduct* was unconstitutional, or if a general constitutional rule already identified in the decisional law applies with *obvious clarity* to the specific conduct at issue." *Estate of Reat v. Rodriguez*, 824 F.3d 960, 964-65 (10th Cir. 2016) (citation omitted). "[T]he clearly established law must be 'particularized' to the facts of the case," *Perry*, 892 F.3d at 1124 (citations omitted), and it must relate to the instant facts with "a high degree of specificity." *District of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (internal quotation marks omitted). Indeed, the Supreme Court has repeatedly admonished courts "not to define clearly established law at a high level of generality," *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019) (quoting *Kisela*, 138 S. Ct. at 1152). Plaintiff bears the burden of identifying the clearly established law and may do so by "pointing to either a Supreme Court or Tenth Circuit decision, or the weight of authority from other courts, existing at

the time of the alleged violation." *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017) (citation omitted).

For purposes of comparing the facts of the instant case with the facts of other relevant cases in order to determine if there was clearly established law that would have put the Defendants on notice that their actions were unconstitutional, the Court finds the following facts to be material: (1) When Armijo was booked at the SCDC, he denied being suicidal and he denied past suicide attempts; (2) during Armijo's three-day incarceration, he was seen by EMS personnel three times; (3) after the first two evaluations by EMS personnel, Armijo signed a document refusing further medical treatment; (4) after the third evaluation by EMS personnel, Armijo was transported to the hospital where he was diagnosed with various issues related to his foot, ankle, and hip; (5) Defendants were aware of information related to Armijo's potentially unstable mental state from at least three sources including the call from Armijo's brother, Roy, information from an unknown source that Armijo had previously attempted suicide, and Armijo's potential self-harm incident in his cell; and (6) the morning of Armijo's suicide, Armijo spoke with Defendant Diaz about an upcoming doctor's appointment and with Defendant Pargas about his charges, bond, and next judicial appearance.

*ii. Plaintiff's Argument Fails Under the Clearly Established Prong*

Plaintiff argues that Defendants are not entitled to qualified immunity under the clearly established prong because Defendants denied Armijo access to medical care, and

11

"[t]he law has been clearly established in the Tenth Circuit . . . that a jailer's total denial or prevention of care to an inmate in the face of a known serious medical condition" is a constitutional violation.  *See doc. 92* at 29.  In particular, Plaintiff argues that Defendants were aware of Armijo's "substantial risk of suicide" based on Armijo's behavior but "did nothing at all" to provide him with medical treatment for his suicidal symptoms.  *Id.* at 32.  For support of the proposition that Defendants violated Plaintiff's clearly established constitutional rights, Plaintiff relies primarily on two cases within the Tenth Circuit—*Sealock v. Colorado*, 218 F.3d 1205 (10th Cir. 2000), and *Mata v. Saiz*, 427 F.3d 745 (10th Cir. 2005).

In *Sealock*, an inmate, Sealock, called for help from prison officials around 2:00 a.m. because he was experiencing chest pains, extreme sweating, vomiting, and trouble breathing.  218 F.3d at 1207-08.  One prison official, Officer Barrett, refused to do anything until the morning.  *Id.* at 1208.  In the morning, a nurse at the prison's infirmary, Nurse Huber, assessed Sealock and diagnosed him with the flu.  *Id.*  Later that morning, Nurse Huber told a physicians' assistant, P.A. Havens, about Sealock's condition, and Havens treated Sealock with antihistamines.  *Id.*  The next day a different doctor assessed Sealock and sent Sealock to the hospital where he was diagnosed with a heart attack.  *Id.*  The Court found that Officer Barrett's actions could be found by a jury to be deliberately indifferent because he "knew of and disregarded the excessive risk to [Sealock's] health that could result" from not providing Sealock with medical care.  *Id.* at

1210.  In addition, the Court held that, assuming P.A. Havens was told by Nurse Huber that Sealock was experiencing chest pains,[4] a jury could also find Havens' actions to be deliberately indifferent because he "prevent[ed] an inmate from receiving treatment or den[ied] him access to medical personnel capable of evaluating the need for treatment." *Id.* at 1211.  Notably, however, Nurse Huber was granted qualified immunity because "[a]t worst, she misdiagnosed [Sealock] and failed to pass on information to [Havens]." *Id.*

In *Mata*, an inmate, Mata, sought medical attention from Nurse Weldon, a nurse at the infirmary in Mata's correctional facility, due to severe chest pains.  427 F.3d at 750.  Nurse Weldon refused to provide any care and told Mata to return in the morning when, after several other interactions with prison officials, Mata was taken to the hospital and diagnosed with a heart attack.  *Id.*  Like in *Sealock*, the court found that Nurse Weldon was deliberately indifferent to Mata's medical needs because she "refused to perform her gatekeeping role in a potential cardiac emergency by not seeking a medical evaluation for Ms. Mata from [another medical professional]." *Id.* at 756.  The court contrasted its finding for Nurse Weldon with the *Sealock* court's finding for Nurse Huber because, unlike Huber, Weldon "completely refused to assess or

---

[4] Whether Nurse Huber informed P.A. Havens about Sealock's chest pains was in dispute.  *Sealock*, 218 F.3d at 1208.

13

diagnose Ms. Mata's medical condition at all by, for instance, taking her blood pressure, listening to her heart with a stethoscope, and performing a cardiac work-up." *Id.* at 758.

Neither *Sealock* nor *Mata* involved facts that are sufficiently "particularized" to the facts of the instant case such that they would have put Defendants on notice that their actions were unconstitutional. *See Perry*, 892 F.3d at 1124. In both *Sealock* and *Mata*, the defendants were approached by a prisoner who was displaying outward physical symptoms of a heart attack such as sweating, vomiting, and chest pains. By contrast, Armijo was suicidal, a medical condition which presents in fundamentally different ways than a physical ailment like a heart attack. Indeed, Armijo was arguably not displaying outward symptoms of suicide since he explicitly told officials he was not suicidal during the booking questionnaire, he had been seen by EMS personnel and hospital staff four separate times, none of whom noted any outward suicidal symptoms, and he discussed future events on the morning of his suicide. UMFs 3, 4, 6–8, 9, 10.

More importantly, the facts of *Sealock* and *Mata* differ materially from the facts of the instant case because the inmates in both cases actively requested medical attention for the symptoms that they were experiencing while Armijo did not. Plaintiff does not cite any evidence—nor has the Court independently found any evidence—showing that Armijo ever affirmatively requested medical attention for his suicidal ideations at any point during his jail stay. In fact, not only did Armijo not request medical attention for his suicidal ideations, he also signed a document refusing further medical treatment on

14

two separate occasions. UMFs 4, 6. Defendants, particularly Defendant Pargas, had some information that Armijo may be suicidal from Armijo's brother's phone call, the information regarding Armijo's past suicide attempt, and Armijo's potential self-harming incident. UMFs 6, 12, 13. However, none of this information came directly from Armijo, and third-party information about potential suicidal ideations does not create a factual scenario that is "materially similar" to the factual scenarios in *Sealock* and *Mata* in which the inmates affirmatively asked for medical attention. *See Estate of Reat*, 824 F.3d at 964–65 (stating that a right is clearly established "if courts have previously ruled that *materially similar conduct* was unconstitutional") (citation omitted). Defendants could not have been expected to understand *Sealock* and *Mata* to mean that jail officials commit a constitutional violation when they fail to seek medical attention for an inmate who is potentially suicidal based upon third-party information, but who is not displaying outward symptoms of suicide and does not ask for help for his suicidal ideations.

There is another crucial difference between the facts of *Sealock* and *Mata* and those of the instant case that preclude Plaintiff from relying on these cases as a source of clearly established law. Defendant Havens in *Sealock* and defendant Weldon in *Mata* were medical professionals who were trained to assess and treat conditions like a heart attack, yet they willfully failed to act on pertinent medical information to either provide treatment or find another individual who could provide treatment. *Sealock* and *Mata*

15

thus do not clearly establish that non-medical jail officers, like Defendants, must assess and then provide treatment or access to treatment for medical issues, particularly when the medical issue is as difficult to assess as suicidal ideation. Although the court's holding with respect to defendant Barrett in *Sealock* appears to stand for the proposition that non-medical jail officials must provide some kind of access to medical care if an inmate is experiencing a medical emergency with outward symptoms, such as chest pains, sweating, and vomiting, *see* 218 F.3d at 1210, Defendants in the instant case did provide Armijo with prompt access to treatment every time that he presented with outward symptoms, such as numbness in his legs or a potential head injury. *See* UMFs 4, 6, 7. As a result, Defendants' actions are not comparable to the actions of the defendants in *Sealock* and *Mata* who observed an inmate experiencing an active medical emergency yet refused to provide any assistance.

Presumably because neither *Sealock* nor *Mata* involved a jail suicide, Plaintiff also identifies the Tenth Circuit case *Estate of Vallina v. Petrescu*, 757 F. App'x 648 (10th Cir. 2018) (unpublished), as a source of clearly established law. In *Petrescu*, the court held that the defendants were not deliberately indifferent to an inmate who had received some mental health treatment during a competency exam but ultimately committed suicide. 757 F. App'x at 649, 651. The *Petrescu* court noted that *Mata* established that "denial of access to treatment for a serious medical condition constitutes deliberate indifference," but ultimately held that the facts in *Petrescu* "concern[ed] the failure to

'treat a serious medical condition properly,' which [the Tenth Circuit has] long held fails to evince deliberate indifference." *Id.* at 651 (citing *Sealock*, 218 F.3d at 1211) (discussing *Mata*, 427 F.3d at 759). Plaintiff acknowledges that the *Petrescu* opinion was released after the events in the instant case took place, and thus Defendants could not have known about the *Petrescu* holding. *Doc. 92* at 31. However, Plaintiff appears to argue that the Tenth Circuit's reference to *Mata* in the *Petrescu* opinion supports the idea that at the time *Mata* was published, the Tenth Circuit would have considered denial of access to treatment for a serious medical condition to be deliberate indifference in cases involving suicide as well as cases involving other medical conditions, such as a heart attack. *See id.* at 31-32.

Plaintiff's reliance on *Petrescu* is unpersuasive for several reasons. Regardless of whether the Tenth Circuit *would* have found that denial of access to treatment for suicide was deliberate indifference, no such case existed at the time of the events surrounding Armijo's suicide. In fact, *Petrescu* does not even make this finding. 757 F. App'x at 651 (finding that the facts of *Petrescu* "concern the failure to 'treat a serious medical condition properly'" rather than a denial of access to treatment). As a result, even assuming that Defendants did deny Armijo access to medical care for his suicidal ideations, a conclusion that the Court declines to reach, Defendants were not on notice that their actions surrounding Armijo's suicide constituted deliberate indifference. The Court also notes that even if *Petrescu* were decided before the events surrounding

17

Armijo's suicide, it is an unpublished case. Although the Court may rely on an unpublished opinion to find that "the law was *not* clearly established," "an unpublished opinion . . . provides little support for the notion that the law is clearly established on a point." *Grissom v. Roberts*, 902 F.3d 1162, 1168 (10th Cir. 2018).

Plaintiff does not identify any other relevant case law that clearly establishes that Defendants violated Armijo's constitutional rights during the events surrounding Armijo's suicide, and the Court, in its independent review, was unable to find any. Because Plaintiff has not carried his burden of showing a clearly established constitutional violation under the second prong of the qualified immunity test, Defendants are entitled to qualified immunity, *Pearson*, 555 U.S. at 232, and Plaintiff's claim of deliberate indifference under the Eight Amendment fails for both Defendant Diaz in his individual capacity and Defendant Pargas in her individual and supervisory capacity.

## V.     RESOLUTION OF REMAINING CLAIMS

The rulings above dispose of Counts II, III, and IV in Plaintiff's Second Amended Complaint. *See doc. 40*. As Count I is based on state law and Plaintiff does not invoke the Court's diversity jurisdiction, *see doc. 1*, the Court's continued exercise of jurisdiction over this case would rest on its supplemental jurisdiction. *See* 28 U.S.C. § 1367. Upon dismissal of Plaintiff's federal claims, the Court must decide whether or not it will adjudicate any remaining state law claims. *See* 28 U.S.C. § 1367(c)(3) ("The district courts

may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction[.]"). When all federal claims have been dismissed from a case, supplemental state claims are ordinarily dismissed without prejudice. *See Roe v. Cheyenne Mountain Conf. Resort*, 124 F.3d 1221, 1237 (10th Cir. 1997). As the Court sees no reason to depart from the ordinary rule, it will decline to exercise jurisdiction over Plaintiff's remaining state law claim and dismiss it without prejudice.

VI. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendants' Motion for Summary Judgment. *Doc. 82.* Plaintiff's federal claims brought under 42 U.S.C. § 1983 are DISMISSED WITH PREJUDICE. The Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state claim, and this claim is DISMISSED WITHOUT PREJUDICE.

**IT IS SO ORDERED.**

_____
GREGORY B. WORMUTH
UNITED STATES MAGISTRATE JUDGE
**Presiding by consent**